**Opinion issued April 20, 2021.**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-19-00294-CV**

———————————

**MERCHANTS GROUP, INC., Appellant**

**V.**

**OM & DEV SHAH, LLC, Appellee**

On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Case No. 16-CV-1473

## MEMORANDUM OPINION

Merchants Group, Inc. ("Merchants") appeals from the trial court's judgment awarding exemplary and lost profit damages to OM & Dev Shah, LLC ("OMD") for breach of contract and fraud following a jury trial. In four issues, Merchants challenges the legal and factual sufficiency of the evidence supporting the jury's

award of $97,360.98 in exemplary damages and $17,666.67 in lost profits. We affirm in part and reverse and render in part.

## Background

OMD owns and operates the O&D Fuel Stop, a gas station in Santa Fe, Texas. Dharmesh and Purvi Shah are OMD's owners. Merchants, which is owned by Fayiaz Merchant, serves as a middleman between oil and gas companies and local gas stations. In 2010, OMD and Merchants entered into a ten-year Fuel Supply Agreement ("FSA") under which Merchants agreed to supply fuel to OMD and OMD in turn agreed to purchase fuel for its gas station exclusively from Merchants.

In 2016, OMD filed suit against Merchants for breach of contract, breach of fiduciary duty, fraud, negligence, quantum meruit, and promissory estoppel. OMD sought actual and exemplary damages, injunctive relief, and attorney's fees. Merchants counterclaimed for breach of contract and quantum meruit.

### A. Trial Proceedings

A four-day jury trial began in September 2018. The jury heard testimony from Dharmesh Shah, Purvi Shah, Tanzeel Merchant, Fayiaz Merchant, and Mohini Puppala. The parties also introduced several exhibits, including the FSA and several invoices.

Dharmesh is an engineer at NASA. His father runs the O&D Fuel Stop during the day and Dharmesh works at the gas station in the evening. Dharmesh testified that his gas station is a "low volume" station.

OMD and Merchants executed the FSA in December 2010. Under the FSA, Merchants was required to send fuel prices to OMD every day, brand the O&D Fuel Stop with the Conoco image, and deliver fuel to OMD within twenty-four to forty-eight hours after OMD placed an order.

Dharmesh testified that, during the first five or six months of 2011, Merchants relayed fuel prices to him over the phone because he did not have a fax machine. Once he joined eFax, Dharmesh began to receive fuel prices on his phone as a virtual fax. Merchants, however, stopped providing him with fuel prices in 2014 and, as a result, Dharmesh did not know the price of the fuel until he received an invoice. Dharmesh testified that when Merchants failed to provide him with fuel prices, he looked at competitors' prices in the area, including the Shell gas station across the street, to determine what he should charge. Dharmesh testified that he called Merchants many times to inform them that he was not receiving fuel prices, and that he received fuel pricing only when he called Merchants to request it.

Dharmesh testified that Merchants charged OMD for numerous expenses related to the Conoco branding of the O&D Fuel Stop. Plaintiff's Exhibit 2, a spreadsheet of branding expenses prepared by Merchants, was admitted into

evidence. The spreadsheet reflects a charge of $17,666.75 for "paint installation of canopy/gutters and other miscellaneous" expenses. Dharmesh testified that Merchants overcharged him $4,000, because Flaah Construction, the company that performed the work, billed Merchants only $13,666.75 for the work. In support of his claim, the invoice from Flaah Construction reflecting a total cost of $13,666.75 was admitted into evidence.

Merchants's spreadsheet of branding expenses reflects a total amount of $51,179.29 and a "reimbursement from Conoco Phillips for store imaging" in the amount of $24,000, leaving a final balance for branding expenses of $27,179.29. Dharmesh testified that a dispute arose between OMD and Merchants as to who would pay the remaining balance. According to Dharmesh, he and Fayiaz Merchant agreed that OMD would pay $15,000 and Merchants would pay the remaining $12,179.29. Dharmesh testified that Fayiaz agreed he could make monthly installment payments of $1,000 towards the $15,000 balance.

On June 29, 2012, Merchants faxed Invoice 8029, dated November 3, 2011, to OMD. The invoice reflects the following notation: "Discount given to Dharmesh (Fayiaz Merchant) -12,179.29." The invoice also reflects that OMD made eight monthly payments of $1,000 to Merchants—either as an automatic debit from

OMD's account or by check—between October 1, 2011 and June 19, 2012.[1]

Dharmesh testified that he made a ninth payment, and that Merchants later updated the invoice to reflect that payment. Merchants's Invoice 12164 reflects that Dharmesh made a ninth installment payment of $1,000 on July 30, 2012.

Dharmesh testified that despite paying Merchants $9,000 towards the $15,000 owed by OMD in branding costs by June 2012, Merchants still charged OMD the entire $27,179.29 in branding costs in 2016, including the $12,179.29 discount Merchants previously agreed it would extend to OMD. Invoice 12011, dated August 16, 2016, reflects the following charge: "Branding Expenses at O&D Food Mart 27,179.29."

Dharmesh testified that the gas station's credit card proceeds were routed directly to Merchants's bank where the funds were adjusted toward OMD's unpaid fuel invoices first and any remaining balance paid to OMD. Dharmesh testified that credit card sales make up approximately sixty to eighty percent of the gas station's total revenue. According to Dharmesh, Merchants transferred credit cards funds back to OMD on only two occasions.

In August 2016, Dharmesh contacted Merchants to inquire why it had not yet paid OMD the almost $50,000 owed in credit card fees. Merchants informed

---

[1] The invoice also includes the charge of $17,666.75 for "Paint Installation of canopy/gutters and other Misc." expenses.

Dharmesh that Conoco intended to "debrand" his gas station because OMD had not updated its "POS" (point of sale) system. Dharmesh learned that Conoco had sent several notices to Merchants advising it that OMD needed to update its POS system, but Merchants never informed OMD. Dharmesh testified that OMD paid $8,600 to update its POS system in December 2016.

Dharmesh testified that he tried to place a fuel order in November 2016, but Merchants refused to fulfill it. He also testified that between November 2016 and April 2017, his gas station had nearly no fuel.

In December 2016, OMD sued Merchants and obtained a temporary restraining order directing Merchants to fulfill OMD's fuel orders. In February 2017, the parties appeared in court for a hearing on OMD's request for a temporary injunction. Prior to the hearing, the parties reached an agreement under which Merchants agreed to provide OMD with a letter releasing OMD from the FSA. Dharmesh testified that the FSA prohibited OMD from purchasing fuel from another supplier. As such, he wanted a release to ensure Merchants could not later sue OMD for breach of the FSA.[2] Dharmesh testified that Merchants did not provide the release letter to OMD.

---

[2] Dharmesh testified that after Conoco debranded his gas station, he began purchasing fuel from Sunoco. Dharmesh stated that he had no issues with Sunoco.

6

Dharmesh testified that Merchants also agreed to assist OMD in transitioning to a new Conoco fuel supplier. According to Dharmesh, Merchants failed to send its final invoice and OMD's mystery shopper reports to the potential new supplier, as the new supplier had requested, and the transition did not take place. According to Dharmesh, customers prefer branded fuel to unbranded fuel and being an unbranded gas station hurt his business.

Dharmesh testified that he did not have "the accounting data" but that, based on the amount of gasoline sold, he made approximately $12,000 in net profits in 2014, nearly $14,000 in net profits in 2015, and $11,000 in net profits in 2016. Dharmesh testified that, based on 2014 and 2015, OMD's average two-year net profit was $53,400, and that he was seeking $53,000 in lost profits for 2016.

On cross-examination, Dharmesh testified that Conoco performed an inspection of the gas station four or five months after the parties executed the FSA. During the inspection, the Conoco representative pointed out deficiencies in the station's canopy and stated that fuel deliveries to the station would cease unless OMD made necessary repairs.

Dharmesh testified that shortly after the parties entered the FSA, OMD's fuel orders exceeded 20,000 gallons per month. He testified that, at most, OMD had ordered as much as 38,000 to 48,000 gallons per month.

Dharmesh testified that, beginning in 2012, he contacted Merchants numerous times to discuss Merchants's invoices and the credit card funds he believed Merchants owed to OMD. According to Dharmesh, Merchants's accountant, Mohini Puppala, requested that Dharmesh stop by the office so that the funds could be released to him, but Merchants never paid the amount it owed to OMD.

In October 2016, OMD received its last fuel delivery from Merchants. Dharmesh tried to place a fuel order in November 2016, but Mohini told him Merchants would not fulfill the order given the parties' dispute. That same day, Merchants prepared Invoice 12164 reflecting that OMD owed $9,884.53 for "Unamortized amount due to Phillips 66 out of the $24,000 credit already given." According to Dharmesh, Conoco was seeking to recoup $9,884.53 of the $24,000 reimbursement it had previously issued to Merchants as a result of the gas station's debranding. Dharmesh testified that he never received Invoice 12164 from Merchants.

On redirect, Dharmesh testified that Merchants later sought repayment of the entire $24,000 Conoco reimbursement as well as the $12,179.29 discount Fayiaz had extended to OMD for branding costs. Invoice 12985, dated April 20, 2018, reflects that OMD owed Merchants a total of $97,694.95.

Purvi Shah, Dharmesh's wife, is also an engineer and co-owner of OMD. She testified that she was laid off from NASA and recently received her real estate

8

license.  Purvi testified that she had limited involvement in running the gas station. Her involvement consisted of requesting quotes from vendors when OMD needed to update its POS system and sending one email to request a fuel delivery.  She testified that Dharmesh worked eighteen hours a day and became extremely stressed due to the dispute with Merchants.  Purvi testified that she asked Dharmesh to sell the gas station a long time ago because they were "just surviving" and unable to pay their bills.  She believed it made no sense to work such long hours yet "make nothing."

On cross-examination, Purvi testified that Merchants informed OMD in August 2016 that Conoco intended to debrand the gas station because OMD's POS system was not compliant with state requirements.  She testified that even though Merchants had received two prior notices from Conoco regarding the station's non-compliance, Merchants did not inform OMD.  Purvi stated that Merchants should have communicated with OMD earlier thereby avoiding the need to incur the $8,600 expense to update OMD's POS system without having time to set aside funds for it.

Tanzeel Merchant, Fayiaz's daughter, is Merchants's Vice-President. She processes credit card payments and drafts some of Merchants's leases and FSAs.  In February 2017, Tanzeel negotiated an agreement with OMD's counsel that allowed

9

the parties to pass the temporary injunction hearing scheduled for that month.[3]  She

testified that, during her meeting with OMD's counsel, Merchants agreed to release

OMD from the contract and "transfer" OMD to another supplier.  Tanzeel testified

that she contacted Merchants's Conoco representative to help OMD secure a new

fuel supplier.  Despite the agreement to transfer OMD to another fuel supplier,

Tanzeel testified the parties still disagreed as to the money owed under the FSA.

Tanzeel testified that she did not know what took place after the meeting because

OMD was not one of the dealers whose FSA she handled.  According to Tanzeel,

Merchants has never transferred a dealer or had a dealer debranded, other than OMD.

Tanzeel testified that a fuel distributor may hold a dealer's funds to ensure its

payment of invoices, or it may refuse to deliver fuel if there is an issue of

nonpayment.  According to Tanzeel, a dealer must maintain its fuel volume to avoid

being debranded.  She testified that she was not aware whether the FSA in question

contained a fuel volume provision but that, if it did not, the parties must have agreed

upon volume either orally or in another written agreement.

Fayiaz Merchant is the owner and President of Merchants Group, Inc.  He

testified that the parties verbally agreed that OMD would order 50,000 gallons of

fuel a month.  He acknowledged that the FSA does not include a written volume

---

[3]     Tanzeel attended the meeting on behalf of her father who had recently undergone
        surgery for cancer.

10

provision but testified that Merchants now includes fuel quantity requirements in its contracts.

Fayiaz testified that Dharmesh came to his office and offered to write a check for a portion of the $27,179.29 Conoco branding costs in exchange for a discount. Fayiaz stated that he agreed to reduce OMD's branding costs to $15,000 and to pay the remaining amount of $12,179.29, provided Dharmesh wrote a check for the full amount of $15,000. Fayiaz testified that Dharmesh never wrote the lump-sum check. Fayiaz testified that Merchants agreed to release OMD from the FSA only upon a proper accounting and if OMD paid the money it owed.

Mohini Puppala, Merchants's accountant, oversees the company's bookkeeping functions and reconciles invoices for each customer's account. She testified that the billing and dispatch departments report to her.

Mohini testified that Mr. Martin, a billing department employee, is responsible for ensuring dealers receive fuel prices each day. According to Mohini, OMD did not have a fax number when the parties executed the FSA and, consequently, OMD received fuel pricing by phone or text until it acquired an eFax number.

According to Mohini, Dharmesh informed Merchants that he could not pay the branding costs in one lump sum and asked Merchants to debit OMD's account

11

monthly.  She testified that Fayiaz authorized a payment plan for OMD under which Merchants debited $1,000 per month for branding costs from OMD's account.

Mohini acknowledged that the FSA does not include a fuel-volume requirement, but she believed the parties had verbally agreed that OMD would order 50,000 gallons of fuel per month.  Mohini also offered testimony concerning several invoices in dispute.  Invoice 12421, dated March 14, 2017, reflects that Merchants charged OMD $30,600.  Mohini testified that the amount represented Merchants's projected profit margin had the FSA remained active through the end of its ten-year term.

When asked why OMD's copy of Invoice 12164 reflected that OMD owed only $253.47, but Merchants's copy of the same invoice showed that OMD owed $9,329.25, Mohini testified that Merchants had incorrectly credited OMD $9,000 twice and Merchants's copy of the invoice properly reflected the removal of one of those credits.[4]  Mohini testified that when Merchants corrects an invoice, it makes the correction to the original invoice and sends the corrected invoice to the customer.

Mohini testified that Fayiaz offered Dharmesh two options to pay the owed branding costs: OMD could make a $15,000 lump-sum payment or it could pay

---

[4]     Plaintiff's Exhibit 5, Invoice 12164, does not reflect a double credit of $9,000. Defendant's Exhibit 6, also Invoice 12164, reflects minor corrections for credit card batches and "carry forward amounts." It does not reflect any noted corrections in the amount of $9,000.

$1,000 a month until it paid the entire amount of $27,179.29 in branding costs. Mohini testified that Merchants did not receive a lump-sum payment from OMD and, consequently, Fayiaz instructed Mohini to begin automatic debits of $1,000 from OMD's account towards the full amount of branding costs. Mohini testified that Invoice 8029, reflecting a $12,179.29 branding cost discount to OMD, contains an error because OMD did not make a lump-sum payment, and Merchants later charged OMD the full amount of branding costs.[5]

Mohini testified that Dharmesh never complained to her about a delayed fuel delivery. While she acknowledged that delays can occur, she testified that when they do, they are because of freight company or vendor delays, and not because of Merchants. Mohini testified that OMD received no delayed fuel deliveries.

Mohini testified that Dharmesh never called her to ask why his credit card funds were being held. She stated that dealers can confirm the amount of credit card funds Merchants is holding by reviewing the batch report available to them through their POS system and comparing it to Merchants's invoice. Mohini also testified that when Dharmesh called to ask about fuel pricing, Merchants always provided him with the information.

---

[5]     Invoice 8029 reflects that OMD made nine monthly payments of $1,000 from October 1, 2011 through June 19, 2012, for branding costs.

Mohini testified that, in August 2016, Dharmesh told her he wanted to sell the gas station because his wife had become a licensed realtor. According to Mohini, Dharmesh spoke with Fayiaz who told Dharmesh to "clear the dues," and that is when the problems began.

Mohini testified that in 2011 and 2012, OMD placed full orders of 8,500 gallons twice a month. She testified that one load of 8,500 gallons costs $30,000 to $35,000. Mohini stated that OMD eventually began ordering only one load per month and then its orders decreased to one load every three months. Mohini believed that OMD began ordering less fuel over time because the gas station did not have many groceries and customers did not visit the station. She testified that Dharmesh mentioned the competition from the Shell station across the street often and that OMD's "business [was] going down." Mohini testified that Conoco advised Merchants that OMD's volume was too low. She stated that OMD's decreasing fuel orders undercut the rebates Merchants received from Conoco.

During its case-in-chief, defense counsel called Fayiaz and Dharmesh to testify. Fayiaz testified that when Merchants and OMD executed the FSA, the parties understood that OMD would order 50,000 gallons a month. Fayiaz testified that, based on this understanding, he sent a proposal to Conoco. A Customer Status Update Form, signed by Fayiaz in December 2010, was admitted into evidence. The form shows that OMD would order 50,000 gallons of fuel and 7,500 gallons of diesel

14

every month. Fayiaz testified that if a gas station does not meet its volume targets, Merchants receives fewer rebates due to the deficiency. Fayiaz testified that Conoco does not require the gas station owner to sign the form, and Merchants does not provide the owner with a copy. Fayiaz did not recall whether Dharmesh called him to complain about delayed fuel deliveries or any failure to receive fuel prices.

Fayiaz testified that OMD failed Conoco's mystery shopper visits several times, and that he informed OMD of each failed visit. He testified that Conoco debrands a gas station that fails its program.

Fayiaz testified that Dharmesh came to his office offering to pay off the branding costs but asking for a discount. Fayiaz told Dharmesh that if he wrote a check that day and paid the balance off, Merchants would give him a $12,179 discount. Fayiaz stated that OMD had to pay the full amount of $15,000 to be entitled to the discount.

Fayiaz testified that the trial court issued a temporary restraining order in December 2016, ordering Merchants to fulfill fuel orders from OMD. Fayiaz testified that after issuance of the temporary restraining order, OMD never placed another fuel order, but that Merchants would have fulfilled any order placed by OMD. He also testified that, after the February 2017 meeting between Tanzeel and the Shahs, he instructed Tanzeel to do an accounting of OMD's outstanding balance and release OMD from the FSA upon OMD's payment of the balance. He testified

that he agreed to release OMD from its contract because of the invoicing and nonpayment issues and OMD's dissatisfaction with Merchants.

On cross-examination, Fayiaz testified that Dharmesh approached him about entering into the FSA. He testified that Merchants never writes fuel volume requirements into the FSAs because "[t]hat's the way some things are done." Fayiaz acknowledged that OMD was not ordering 50,000 gallons when the parties first executed the FSA, but he believed that OMD could reach that volume once it became branded with Conoco.

Dharmesh testified that he leased the gas station in 2006, prior to purchasing it in 2010. He stated that, from 2006 to 2010, OMD earned "about 6, $7,000" in net profits. He testified that he paid his part-time employee "whatever the minimum wage was," "[m]aybe $6 or $7" an hour, or approximately $700 a month, and he paid his father "about $1,000 to $1,200 a month." Dharmesh testified that he did not remember what the gas station's average revenue was in 2011, but that it earned "somewhere between $950,000 to $1,000,000" in monthly gross sales in 2015 and 2016. He also testified that, based on his personal data, the gas station earned $851,463 in gross sales in 2017.

Dharmesh testified that his fuel orders decreased because Merchants failed to provide him with fuel pricing information. He stated that he eventually set the gas

station's fuel prices based on his competitors' prices resulting in a loss of $.07 per gallon.

On cross-examination, Dharmesh testified that he generally earns $25,000 or $30,000 after paying the bills. He stated that his gas station had 40,000 to 50,000 fewer gallons of fuel during the five-month period from November 2016 to March 2017, during which Merchants refused to deliver fuel to his station. Dharmesh testified that, based on his data from 2015, 2016, and 2017, OMD lost "around $60,000" because of Merchants's refusal to deliver fuel to his gas station during those five months.

On redirect, Dharmesh testified that he did not order fuel from Merchants from December 2016 to March 2017—despite the December 2016 temporary restraining order directing Merchants to fulfill OMD's fuel requests—because he did not have a clear understanding that he could place a fuel order and Merchants did not reach out to him.

## B.  Jury Charge

After both sides rested, the trial court submitted the charge to the jury. The jury found Merchants liable for breach of contract and fraud and awarded OMD actual and exemplary damages as well as attorney's fees. The jury answered the questions on liability and damages, in part, as follows:

17

## Question 1

Did Merchants Group, Inc. fail to comply with the Fuel Supply Contract?

Answer "Yes" or "No."

Answer: Yes

## Question 5

Did Merchants Group, Inc. commit fraud against OM & DEV Shah, LLC?

Fraud occurs when—

a party makes a material misrepresentation, and

1.    the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

2.    the misrepresentation is made with the intention that it should be acted on by the other party, and

3.    the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means—

1.    A false statement of fact, or

2.    A promise of future performance made with an intent, at the time the promise was made, not to perform as promised

Answer "Yes" or "No"

Answer: Yes

## Question 8

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate OM & DEV Shah, LLC for their damages, if any, that resulted from Merchants Group, Inc.'s actions?

18

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, in any.

1. The Branding and De-branding costs wrongfully billed to and paid by OM & DEV Shah, LLC.

   Answer: $31,013.82

2. The reasonable and necessary costs to replace the P.O.S. system.

   Answer: $0.00

3. Lost Profits that were a natural, probable, and foreseeable consequence of Merchants Group, Inc.'s actions.

   Answer: $17,666.67

## Question 11

Do you find from clear and convincing evidence that the harm to OM & DEV Shah, LLC resulted from any fraud found by you in Question 5?

"Clear and convincing evidence means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No."

Answer: Yes

## Question 12

What sum of money, if any, if paid now in cash, should be assessed against Merchants Group, Inc. and awarded to OM & DEV Shah, LLC, as exemplary damages, if any, for the conduct found in response to Question 5 and 11?

19

"Exemplary" damages means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

1. The nature of the wrong.

2. The character of the conduct involved.

3. The degree of culpability of Merchants Group, Inc.

4. The situation and sensibilities of the parties concerned.

5. The extent to which such conduct offends a public sense of justice and propriety.

6. The net worth of Merchants, Group, Inc.

Answer in dollars and cents, if any.

Answer: $97,360.98

## C. Post-Trial Proceedings

Following the jury trial, OMD filed a motion to enter judgment and Merchants filed a motion to disregard the jury's findings. On January 16, 2019, the trial court entered a final judgment on the jury's verdict in favor of OMD on its breach of contract and fraud claims, awarding OMD (1) $48,680.49 in actual damages, including $17,666.67 in lost profits, (2) $97,360.98 in exemplary damages, and (3) $36,510.37 in attorney's fees. Merchants filed a motion for new trial, which was overruled by operation of law. This appeal followed.

**Discussion**

Merchants raises four issues on appeal. In its first and second issues, Merchants contends that the evidence is legally and factually insufficient to support the award of $97,360.98 in exemplary damages. In its third and fourth issues, it contends that the evidence is legally and factual insufficient to support the award of $17,666.67 in lost profits.

**A.    Standard of Review**

In a legal sufficiency, or no-evidence review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In conducting this review, we credit favorable evidence if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id* at 822. "If there is any evidence of probative force to support the finding, i.e., more than a mere scintilla, we will overrule the issue." *City of Houston v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.— Houston [1st Dist.] 2008, pet. denied) (citing *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005)). When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate

that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983).

When reviewing a jury verdict to determine the factual sufficiency of the evidence, we consider and weigh all of the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The factfinder is the sole judge of the credibility of witnesses and it may choose to believe one witness over another. *City of Keller*, 168 S.W.3d at 819. Because it is the factfinder's province to resolve conflicting evidence, we must assume that it resolved all conflicts in accordance with the verdict if reasonable people could do so. *Id.*

## B. Exemplary Damages

"[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." TEX. CIV. PRAC. & REM. CODE § 41.003(a). "Clear and convincing" evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2).

The record reflects that the jury's finding of $97,360.98 in exemplary damages to OMD (Question 12) was predicated upon its finding that Merchants committed fraud against OMD (Question 5) and its finding from clear and convincing evidence that the harm to OMD resulted from Merchants's fraud (Question 11). Merchants argues that the evidence is legally and factually insufficient to sustain the award of exemplary damages because OMD failed to present evidence to support the jury's finding of fraud. Therefore, we consider whether the evidence supported the jury's fraud finding.

To prevail on a claim of fraud, a plaintiff must establish that (1) the defendant made a material representation; (2) the representation was false; (3) the defendant either knew the representation was false when made or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that it be acted upon; (5) the representation was in fact relied upon; and (6) damage to the plaintiff resulted. *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015). A representation is material if "a reasonable person would attach importance to [it] and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am*., 341 S.W.3d 323, 337 (Tex. 2011).

In its brief on appeal, OMD argues that it presented sufficient evidence establishing that Merchants committed fraud. OMD asserts that Mohini's testimony established that Merchants (1) intentionally recharged OMD $27,000 that OMD had already paid; (2) intentionally added a 2012 charge to a 2011 invoice; (3) intentionally removed OMD's previous installment payments of $9,000 from its invoice and recharged OMD for the amounts; (4) arbitrarily charged OMD $30,600 based on Merchants's estimated future profit margin; and (5) agreed to give OMD a $12,179.29 discount and then intentionally removed the credit from its invoice.

As to OMD's first and third assertions, Invoice 12011 shows that Merchants charged OMD $27,179.29 in branding costs after OMD had already paid $9,000 toward the cost. Mohini testified that Fayiaz made the decision to recharge OMD for the full amount of branding costs. She further testified that the invoice reflects a balance of $0.00, which means that OMD paid the full amount of the invoice, including the recharged amount of $27,179.29. Taken in the light most favorable to OMD, we conclude that there is more than a scintilla of evidence from which a reasonable factfinder could have found that Merchants made a material misrepresentation to OMD that it owed an amount that it in fact did not, Merchants made the misrepresentation recklessly without any knowledge of its truth and with the intention that OMD act upon it, and OMD relied on the misstatement when it paid the recharged amount, resulting in damage to OMD. *See City of Keller*, 168

24

S.W.3d at 822. Further, we conclude that this evidence is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176.

As to OMD's second and fourth assertions—that Merchants intentionally added a 2012 charge of $3,000 to a 2011 invoice and arbitrarily charged OMD $30,600 based on Merchants's estimated future profit margin had the FSA remained in effect—we find no evidence, nor does OMD direct us to any, reflecting that OMD actually paid these amounts. Thus, there was no evidence from which the jury could have found that OMD suffered damage due to these alleged misrepresentations.

In its fifth assertion, OMD contends that Merchants agreed to give OMD a $12,179.29 discount and then intentionally removed the credit from its invoice. Dharmesh testified that a dispute arose between the parties as to whether OMD or Merchants would pay for the branding costs. He testified that he and Fayiaz agreed that OMD would pay $15,000 and Merchants would pay the remaining amount of $12,179.29, and that Fayiaz told him he could make monthly installment payments of $1,000. Fayiaz testified that he agreed to reduce OMD's portion of the branding costs to $15,000 on the condition that Dharmesh write a check for the full amount, and that Merchants would pay the remaining amount of $12,179.29. Fayiaz testified that Dharmesh never wrote the check. Mohini also testified that Fayiaz withdrew the discount because Dharmesh did not make a lump-sum payment of $15,000.

25

Taking the evidence in the light most favorable to OMD, Dharmesh's testimony constitutes more than a scintilla of evidence from which a reasonable factfinder could have found that Merchants made a material misrepresentation that it would discount OMD's portion of the branding costs, Fayiaz knew the representation was false when he made it or made it recklessly without any knowledge of its truth, Merchants intended that OMD act upon it, and OMD relied on Fayiaz's promise which resulted in damage to OMD when it had to repay the full amount of $27,179.29. *See City of Keller*, 168 S.W.3d at 822. We further conclude that this evidence is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Although Fayiaz and Mohini testified that the discount was conditioned upon OMD making a $15,000 lump-sum payment, it was the jury's province to resolve conflicting evidence, and we assume that it resolved all conflicts in accordance with its verdict. *See City of Keller*, 168 S.W.3d at 819 (noting factfinder is sole judge of credibility of witnesses and it may choose to believe one witness over another).

We therefore hold that the evidence is legally and factually sufficient to support the jury's findings of fraud and exemplary damages. We overrule Merchants's first and second issues.[6]

---

[6]     Because Merchants does not challenge the amount of exemplary damages awarded to OMD, we need not consider whether the award was excessive.

## C.    Lost Profits

In its third and fourth issues, Merchants contends that the evidence is legally and factually insufficient to support the award of $17,666.67 in lost profits. It argues that OMD did not offer any competent evidence from which lost profits could be calculated and awarded with reasonably certainty. OMD asserts that it based its lost profits on the previous two-year net returns and amounts sold.[7]

"To be recoverable, lost profits must be proven by competent evidence with reasonable certainty." *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.— Houston [1st Dist.] 2004, no pet.). Recovery of lost profits does not require that the loss be susceptible to exact calculation. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). The injured party, however, must do more than show that it suffered some lost profits. *Id*. Mere evidence that the plaintiff expected to make a profit within a certain range at a certain time is legally insufficient to show lost profits. *See Szczepanik v. First So. Trust Co.*, 883 S.W.2d 648, 650 (Tex. 1994). Opinions or estimates are competent evidence of lost profits if based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *See id.* at 649. It is not necessary to produce in court documents supporting the opinions

---

[7]    OMD also points out that the jury, after hearing the evidence, awarded its own calculation of lost profits. The jury awarded $17,666.67 in lost profits to OMD which is nearly identical to the $17,666.75 Merchants charged OMD for "paint installation of canopy/gutters and other miscellaneous" expenses, as reflected in Plaintiff's Exhibit 2.

or estimates, although supporting documentation may affect the weight of the evidence. *See Heine*, 835 S.W.3d at 84.

Lost profits must be based on net profits, not gross revenues. *See Texaco*, 137 S.W.3d at 771 (citing *Heine*, 835 S.W.2d at 83 n.1). "Net profits" is defined as the difference between a business's total receipts and all expenses incurred in carrying on the business. *Id.* (citing *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App.—Dallas 1988, writ denied)). Recovery of lost profits must be predicated on one complete calculation, but there is more than one correct method to calculate lost profits. *See Heine*, 835 S.W.2d at 85.

At trial, Dharmesh testified that he did not have the accounting data but that, based on the amount of gasoline sold, he made approximately $12,000 in net profits in 2014, nearly $14,000 in net profits in 2015, and $11,000 in net profits in 2016. He testified that, based on 2014 and 2015, OMD's average two-year net profit was $53,400, and that he was seeking $53,000 in lost profits for 2016. Dharmesh later testified that, based on his data from 2015, 2016, and 2017, OMD lost "around $60,000" because of Merchants's refusal to deliver fuel to his gas station from November 2016 to March 2017. He also testified that, based on his personal data, the station earned $851,463 in gross sales in 2017.

Based on this testimony, it is not clear, nor does OMD explain, how OMD calculated its estimated lost profits for 2016 as $53,000 or, alternatively, $60,000,

28

based on its average two-year net profits from 2014 and 2015. OMD did not show the method it used to calculate its stated lost profits. *See Texaco*, 137 S.W.3d at 772 (finding evidence of lost profit damages insufficient where, among other things, gas station owners' affidavits did not indicate whether their profit margins represented gross profit margin or net profit margin and did not show method they used to calculate their stated profit margins).

We further note that lost profits are not recoverable where nothing in the record connects the total amount of profits the plaintiff expects to make to those actually lost as a result of the defendant's wrongful act. *See Szczepanik*, 883 S.W.2d at 650; *see also Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182–83 (Tex. 1995) (holding that shopping center landlord did not establish causal nexus between legal malpractice and foreclosure on shopping center where there was no evidence that tenant's vacating premises was result of any act of attorney). In this case, Dharmesh sought to recover $60,000 in lost profits, testifying that, based on his data from 2015, 2016, and 2017, OMD lost "around $60,000" due to Merchants's refusal to deliver fuel to the gas station from November 2016 through March 2017.[8] Dharmesh testified that he tried to place a fuel order in November 2016, but

---

[8] OMD did not present testimony or other evidence connecting its requested amount of lost profits to Merchants's failure to provide fuel pricing information to OMD. Rather, OMD's lost profit calculations were based solely on Merchant's failure to deliver fuel to OMD during this five-month period.

Merchants refused to fulfill the order. However, Dharmesh also testified that the trial court granted a temporary restraining order in December 2016, directing Merchants to fulfill OMD's fuel orders. Despite the order, OMD did not place further orders with Merchants. When asked why OMD had not ordered fuel from Merchants between December 2016 and March 2017, even though it could have done so, Dharmesh testified he did not know he could place a fuel order and Merchants did not reach out to him. OMD thus failed to present evidence showing how Merchants caused OMD to lose profits from December 2016 to March 2017.

Because we conclude that OMD failed to meet its burden of proving lost profits, we hold that the evidence is legally insufficient to support the award of $17,666.67 in lost profits to OMD. We sustain Merchants's third issue.[9]

---

[9] Because we hold that the evidence is legally insufficient to support the jury's award of lost profit damages, we need not address Merchants's fourth issue challenging the factual sufficiency of the evidence. *See Smith v. Davis*, No. 12-12-00169-CV, 2013 WL 2424266, at *6 (Tex. App.—Tyler June 5, 2013, pet. denied) (mem. op. on reh'g) (citing *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981)).

## Conclusion

We reverse the portion of the trial court's judgment awarding $17,666.67 in lost profit damages to OMD and render judgment that OMD take nothing on its claim for lost profits. We affirm the remainder of the trial court's judgment.


Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Radack and Justices Kelly and Rivas-Molloy.